# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

LAWRENCE R. ROUBEN, M.D., )
and WILLIAM W. LAWRENCE, )
Bankruptcy Trustee, )
                          )
      Plaintiffs, )
                          )
v. )      **Cause No.: 1:10-CV-397**
                          )
PARKVIEW HOSPITAL, INC., and )
GREG JOHNSON, D.O., )
                          )
      Defendants. )

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by defendants Parkview Hospital, Inc. ("Parkview") and Greg Johnson, D.O. ("Dr. Johnson") on January 30, 2012 (docket at 33, and accompanying memorandum of law at 34).[1] Plaintiff Lawrence R. Rouben, M.D. ("Dr. Rouben") filed a response in opposition to the motion on February 28, 2012 (docket at 40). Defendants filed a reply brief on March 15, 2012 (docket at 44). Also before the Court is the motion to strike portions of plaintiff's affidavit, which was also filed on March 15,

---

[1] On August 29, 2012, while the pending motions in this case were under advisement, plaintiff filed a "Notice of Bankruptcy Filing" (docket at 48). Accordingly, this case was stayed to allow the Chapter 7 Bankruptcy Trustee assigned to plaintiff's bankruptcy case to review the case and determine how best to proceed (given that any claims asserted in this case became property of the plaintiff's bankruptcy estate on the date of the filing of his Chapter 7 proceeding). (The bankruptcy proceeding was filed in the U.S. Bankruptcy Court for the Western District of Kentucky. *See* plaintiff's Fourth Amended Complaint, docket at 53, p. 2, ¶ 13.) Plaintiff's Fourth Amended Complaint was filed on December 14, 2012, and names the Chapter 7 Trustee as a plaintiff in this suit. On January 4, 2013, defendants filed a motion to dismiss the Fourth Amended Complaint (docket at 54). However, U.S. Magistrate Judge Roger B. Cosbey, to whom this case is assigned on partial referral, denied that motion in an order issued on January 30, 2013 (docket at 57). As a result of these procedural events, the original motion for summary judgment and the motion to strike are now ripe for resolution.

2012 (docket at 45). Plaintiff filed his response to that motion on April 13, 2012 (docket at 47) and defendants did not file a reply brief. For the reasons discussed below, the motion for summary judgment is GRANTED and the motion to strike is DENIED AS MOOT. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975

F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989).

But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to

establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,*

477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove

one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence to

support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving

statements, which are speculative or which lack a foundation of personal knowledge, and which

are unsupported by specific concrete facts reflected in the record, cannot preclude summary

judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176

F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993).

### DISCUSSION

Dr. Lawrence Rouben was working as a physician through a company called

Pulmonology & Critical Care Consultants of Louisville, LLC ("PCCC"). Fourth Amended

Complaint, docket at 53, p. 3. Dr. Rouben entered into a contract on October 8, 2007, through

PCCC, with CHG Companies, Inc., d/b/a CompHealth, a healthcare staffing agency. *Id.*

Through this arrangement, Dr. Rouben was employed as a physician with defendant Parkview.

*Id.* Dr. Rouben's contract with Parkview (through PCCC and CHG) ran from June 20, 2008, to

December 31, 2008. *Id.* On or about August 6, 2008, Dr. Rouben was informed by Parkview

administrators, including defendant Dr. Greg Johnson, that several hospital employees had

complained that Dr. Rouben had made inappropriate comments to them during the course of his

employment.  *Id*.  Dr. Rouben claims that he "was never informed of the specific details of any allegation[.]" and that he "never received formal written notice of any allegation."  *Id*., ¶¶ 22-25.

On or about July 27, 2008, Dr. Rouben "entered into a contract with Gulfport Memorial Hospital ["Gulfport"], wherein Plaintiff agreed to accept employment with [Gulfport], serving as Medical Director of the Intensive Care unit and Director of the Intensivist Program."  *Id*., p. 4, ¶ 30.  "On or about October 24, 2008, Plaintiff received a letter from [Gulfport] indicating that Parkview Hospital had informed [Gulfport] that Plaintiff's clinical privileges at Parkview Hospital had been terminated and that Plaintiff had not fulfilled the terms of his contract at Parkview."  *Id*., ¶ 31.  However, Dr. Rouben also states that "[o]n or about October 28, 2008, Mark Drapala, an administrator at Parkview Hospital confirmed by phone that Plaintiff had fulfilled the terms of his contract and that his clinical privileges had not been revoked."  *Id*., ¶ 32.  At some point, Gulfport found out about the allegations made by certain Parkview employees and allegedly informed Dr. Rouben that it did not intend to honor his contract with Gulfport.  *Id*., p. 5.  Dr. Rouben adamantly denies saying or doing anything inappropriate while working at Parkview and alleges in this lawsuit that Parkview is liable to him under several theories.  *Id*., pp. 5-8.  He asserts five claims against Parkview and Dr. Johnson including: tortious interference with a business relationship; tortious interference with contract; defamation; breach of contract; and civil conspiracy.  *Id*.

In their memorandum in support of their motion for summary judgment, defendants argue that all of Dr. Rouben's claims are completely without merit.  Defendants claim that the theories of liability Dr. Rouben advances "relate to two separate, but related, sets of fact: (1) the manner in which defendants conducted an in house fact-finding after charges of inappropriate touching,

sexual innuendo, and intemperate verbal outbursts were reported by staff members to defendants while plaintiff was employed by Parkview[;] and (2) defendants' response to requests by Memorial Hospital at Gulfport, Gulfport, Mississippi, during its credentialing process for an accounting of plaintiff's tenure at Parkview." Defendants' Memorandum, p. 1. Defendants maintain that they "are also protected from plaintiff's defamation claims via the 'common interest' privilege." *Id.*, pp. 1-2. Finally, defendants state that "[i]n addition to these complete defenses, the facts do not support any of plaintiff's theories of recovery." *Id.*, p. 2.

According to the defendants, Dr. Rouben was hired by Parkview pursuant to a *locum tenens* agreement, which called for him to serve as a physician at Parkview from June 2008 through December 2008.[2] However, "on or before August 8, 2011[3], Dr. Johnson received a staff complaint about Dr. Rouben's conduct." *Id.*[4] Pursuant to Parkview's own policies, as well as

---

[2] According to defendants, the term *locum tenens* "can be found defined at 42 C.F.R. § 411.351 as a 'physician who substitutes (that is, 'stands in the shoes') in exigent circumstances for a physician, in accordance with applicable reassignment rules and regulations.'" Defendants' Memorandum, p. 15, n. 3.

[3] This date appears to be a scrivener's error, and should read "August 8, 2008." On page 6 of their memorandum, defendants state that Dr. Johnson received a "written complaint" regarding Dr. Rouben's alleged inappropriate behavior "[s]ometime before August 6, 2008 . . ." There are other instances of confusion about the precise dates of certain events in the parties' pleadings. For example, in his Fourth Amended Complaint, Dr. Rouben states that his *locum tenens* contract with Parkview was for the term from "June 20, 2008 to December 31, 2008." Fourth Amended Complaint, p. 3. In his response to defendants' motion for summary judgment, Dr. Rouben states that his "assignment with Parkview began on or about June 23, 2008[.]" and that it "was to expire October 31, 2008." Plaintiff's Response, p. 1. One thing the parties agree on is that Dr. Rouben had the option of terminating the contract on 30 days notice. Defendants' Memorandum, p. 6; Plaintiff's Response, p. 1. Fortunately, these minor discrepancies have no affect on the issues before the Court.

[4] According to defendants, the complaints against Dr. Rouben included, among many others, an allegation that Dr. Rouben, while a female nurse was bent over by a file cabinet, said "as long as you are down there, you might was well take care of me while you are down there"; an allegation that Dr. Rouben told another nurse to "get on your knees"; allegations that Dr.

EEOC and Title VII regulations, Dr. Johnson initiated an investigation into the matter, appointing Ms. Dena Jacquay ("Jacquay"), a Parkview human relations employee, to head the investigation. *Id.* Parkview claims that Jacquay interviewed as many as "18 witnesses who largely supplemented and corroborated the charges that had originally been brought to Dr. Johnson's attention." *Id.* Defendants claim that "[w]hen Ms. Jacquay's investigation was complete Dr. Rouben was invited to discuss the investigation but declined. Instead, Dr. Rouben resigned his position and pursued full time employment at Gulfport. When asked by Gulfport about the circumstances surrounding Dr. Rouben's departure Parkview responded with a carefully worded and truthful letter." *Id.* Ms. Jacquay summarized her findings in writing and delivered her report to Dr. Johnson "in September 2008." *Id.*, p. 8. Defendants state that "Dr. Rouben left his work at Parkview before expiration of his privileges after learning of the allegations of inappropriate conduct. At the time he left, defendants had only completed the preliminary investigation of the charges against Dr. Rouben. Under the Parkview Staff ByLaws they had not even officially entered into 'collegial intervention.'" *Id.* Since Dr. Rouben resigned and sought employment at Gulfport, no meetings took place between Parkview administrators and Dr. Rouben. Finally, defendants state that "[a]t the time he withdrew his application at Gulfport, Dr. Rouben's submission was incomplete as of October 24, 2008 because he had not provided proof of his Mississippi license [or] supplied references or complete references" from former employers, including Parkview. *Id.*, p. 9. Defendants state that "[a]s of November 18,

---

Rouben "gav[e] out his phone number and ma[de] personal advances to staff"; allegations that Dr. Rouben engaged in "some touching incidents . . ."; and allegations that Dr. Rouben engaged in "yelling and being inappropriate (yelling in a loud and aggressive manner) on the unit in front of patient family members." Defendants' Memorandum, pp. 6-7.

2008, Dr. Rouben's application for employment at Gulfport was incomplete due to lack of a

valid Mississippi Medical License, a current certificate of insurance and a professional

reference" from one former employer." *Id.* Finally, defendants state that "[i]n addition to

truthfully reporting Dr. Rouben's status upon termination at Parkview, Dr. Johnson participated

in a telephone call [with representatives from Gulfport] where, again, he truthfully related what

he knew of Rouben's difficulties at Parkview, as well as his clinical abilities." *Id.*

Defendants maintain that their actions did not defame Dr. Rouben or interfere with his

abilities to pursue employment at Gulfport or anywhere else. Accordingly, defendants argue that

they are entitled to summary judgment as to all of plaintiff's claims.

**1. Immunity defense.**

Parkview and Dr. Johnson claim that they are entitled to immunity from any defamation

claims, "pursuant to Indiana's Peer Review Statutes, I.C. § 34-30-15-1 *et seq.* . . ." *Id.*, p. 1.

Defendants contend that the immunity conferred upon them by the Peer Review Statutes is

similar to immunity defenses contained in the Health Care Quality Improvement Act. *Id.*, pp.

10-11.[5] Defendants begin their discussion of their immunity defense under the Indiana Peer

Review Statutes by discussing at length the interrelationship between the HCQIA and the

applicable Indiana statutes. *Id.*, pp. 10-18. Defendants concede that because their peer review

process was only in the initial investigation stages, the immunity provisions contained in the

HCQIA did not yet attach. *Id.*, p. 11 ("[a]lthough the [HCQIA] does not confer immunity at this

early stage the Indiana Peer Review statutes do."). The defendants' discussion of the immunity

---

[5] The federal Health Care Quality Improvement Act ("HCQIA") is found at 42 U.S.C. §§ 11101-11152.

provisions of the HCQIA and the interrelationship between those provisions and similar ones

contained in the Indiana Peer Review statutes is quite thorough and need not be repeated here.

Suffice it to say that the HCQIA does in fact confer immunity on hospital administrators who are

engaged in a peer review of a physician on their staff. *See* 42 U.S.C. § 11111. Defendants argue

that immunity under the Indiana Peer Review statutes attaches even during an initial (or pre-peer

review) investigation so long as the investigating hospital's policies and bylaws provide for such

review and those policies do not infringe on any due process provisions mandated by the

HCQIA. Defendants' Memorandum, p. 11. Defendants state as follows:

> In contrast to the HCQIA, Indiana guarantees the confidentiality of *all proceedings* of a peer review committee. I.C. § 34-30-15-1 *et seq*. [I]t is only when a health care provider is under *peer review*, that is, when formal proceedings have commenced, that he or she has the right to see any records generated by the committee pertaining to his or her personal practice as well as an opportunity to appear (with adequate representation) before the committee to hear charges. I.C. § 34-30-15-4. So, at the stage Dr. Rouben determined to leave he was not entitled to confront witness[es] or review Ms. Jacquay's written report either under the HCQIA or Indiana's Peer Review procedures.

> However, unlike the HCQIA which confers immunity only at the formal peer review stage, Indiana provides immunity from any action of any nature against "*the personnel of a peer review committee for any act, statement* [sic] *made in the confines of the committee or proceeding of the committee made in good faith in regard to evaluation of patient care as that term is defined and limited in I.C. § 34-6-2-44.*" Moreover, the peer review committee, an organization or any other person either as a witness or "in some other capacity" who renders assistance to a peer review committee is immune from any civil action arising from such assistance unless knowingly furnishing false records or information. I.C. § 34-30-15-23. Accordingly, Dr. Johnson's decision to investigate, his decision to appoint Ms. Jacquay as a deputy of peer review, comments reported to Ms. Jacquay, and Ms. Jacquay's report, were *all* immune under the Indiana statute as she was an agent of peer review and was assisting in the peer review process even though the formal process did not obtain because Dr. Rouben quit.

> Finally, Indiana provides protection for communications during credentialing, *i.e.*, in situations where Parkview communicates with another health care provider information concerning a physician. I.C. § 34-30-15-8. Accordingly, Dr.

> Johnson's communications with Gulfport are also protected by Indiana's Peer
> Review Statutes.

*Id.*, pp. 18-19 (italics in original).

Dr. Rouben contends that immunity does not attach or foreclose his defamation claim. Dr, Rouben argues that "[d]efendants claim that they are immune under Indiana law, because their actions were done in the peer review process and also claim that their protections attach at the earliest stage of an investigation. They claim, however, that Dr. Rouben is not entitled to protections under the statute, because the same peer review actions under which they claim immunity were not 'formal' peer review." Plaintiff's Response, pp. 3-4. Dr. Rouben maintains that the Indiana Peer Review statute clearly provides that "'[a] health care provider under investigation shall be permitted *at any time* to see *any records accumulated by a peer review committee* pertaining to the provider's personal practice.'" *Id.*, p. 4 (quoting I.C. § 34-30-15-4(a) (italics in original)). This means, according to Dr. Rouben, that he "should have been provided reasonable access to any records in Parkview's possession when he asked for them at the initial meeting with Parkview, as well as every other point in the process." *Id.* As to defendants' contention that Dr. Rouben was not entitled to such documents and information because Parkview never took any adverse action against his privileges (he quit before the Hospital could do so), Dr. Rouben argues that "[w]hile Parkview may not have officially taken an action against Dr. Rouben's privileges, it is admitted that Defendants disclosed the allegations and findings of the investigation to Gulfport. Under state law, 'rebuttal information shall be a part of the record before any disclosure of the charges and findings under this chapter is made.'" *Id.* (quoting I.C. § 34-30-15-4(c)). Because of this, argues Dr. Rouben, "Parkview was in violation of state law when it disclosed information about the allegations against Dr. Rouben, unless it provided him

'the opportunity to appear before the review committee with adequate representation to hear all charges and findings concerning the provider's practice and to offer rebuttal information. I.C. § 34-30-15-4(b). A fact question for a jury is created concerning whether waiting until the end of Dr. Rouben's last shift at Parkview and asking if he would like to meet before he left is an opportunity to appear 'with adequate representation.'" Id., p. 5.[6]

In their reply brief, defendants argue that plaintiff "misunderstands or mischaracterizes Dena Jacquay's preliminary investigation of the multiple complaints regarding his conduct, and attempts to justify his refusal to discuss the results of her investigation by inferring a formal, right to 'confrontation' from Indiana statutes and Parkview's Staff By-laws–a right which Rouben asserts survived his departure from Parkview." Defendants' Reply, p. 1. Defendants argue that "if the results of Dena Jacquay's investigation merited it, Dr. Rouben would have first been engaged in 'collegial' intervention. If 'collegial' intervention proved inadequate, his case

_____

[6] Dr. Rouben concedes that he had an initial meeting with Parkview and was informed in vague terms of some of the allegations levied against him. Plaintiff's Response, p. 2. He claims this meeting took place on or about August 6, 2008, which obviously would have been the same day (or close to it) that Dr. Johnson claims he first learned of the allegations. Id. Dr. Rouben states that he informed Parkview officials at that meeting "that he was giving his 30 day notice to terminate his assignment with Parkview." Id. He goes on to explain that his last shift at Parkview was on September 3, 2008, and that "near the end of his September 3 shift, Parkview staff contacted Dr. Rouben and asked whether he would like to know the results of the investigation. . . . Dr. Rouben responded that his last shift was almost over and he did not want to meet with anyone from Parkview." Id. Dr. Rouben maintains, however, that "[o]n or about October 28, 2008, Dr. Rouben spoke with Dr. Johnson and informed him that he would like due process and the opportunity to explain his side of the story." Id., p. 3. Dr. Rouben contends that "[b]ased on advice from Gulfport that his privileges would be denied, unless he could clear up the problems at Parkview, and Parkview's unwillingness to provide him with a meaningful opportunity to address the allegations against him, Dr. Rouben chose to mitigate his damages and withdraw his privileging application [at Gulfport]." Id. In short, plaintiff alleges that Parkview and Dr. Johnson are not entitled to immunity under the Indiana Peer Review statute because they violated the provisions of that statute before he could have a reasonable opportunity to respond to the allegations levied against him.

would have moved on to formalized 'intervention activities' and Dr. Rouben would have been accorded the full panoply of rights he now asserts should have been available to him during Dena Jacquay's investigation. . . . Dr. Rouben argues that I.C. § 34-30-15-4(a) confers a right of inspection upon him that was withheld. . . . There are at least two things patently wrong about this assertion: first, there is no evidence in the Record that Dr. Rouben requested these records until, if at all, he *left* Parkview. Second, the rights conferred by I.C. § 34-30-15-4(a) *et seq*. do not apply *unless and until formal Peer Review occurs*. Provider rights assured by this and succeeding sections of Indiana's Peer Review statutes presume a formal 'investigation.'" *Id*., p. 2 (italics in original). Defendants claim that their position is supported by the clear language of the Indiana Peer Review statute, which states, in relevant part, that "[a] professional health care provider under investigation shall be permitted at any time to see any records accumulated by a *peer review committee*," and that "[t]he provider shall be offered the opportunity to appear before *the peer review committee* with adequate representation to hear all charges and findings concerning the provider's practice and to offer rebuttal information." I.C. § 34-30-15-4(a) (italics added). In other words, according to defendants, since the investigation conducted in this case had not even reached the "collegial intervention" phase under Parkview's policies and bylaws, let alone a formal peer review process, Dr. Rouben's right to examine the information collected and offer his rebuttal had not yet attached and he left Parkview before this could happen. As defendants put it, "[Dr.] Rouben never asserted a right to see any documents while employed at Parkview let alone demand to proceed to peer review. Simply, he made his decision to terminate his relationship with Parkview, refused informal discussion of Dena Jacquay's investigation, and apparently hoped that Parkview would be afraid to relate the facts motivating

11

his departure to Gulfport." Defendants' Reply, p. 3. In summary, defendants maintain that because no formal peer review process had begun, and because Dr. Rouben refused an early opportunity to meet with Dr. Johnson to discuss Ms. Jacquay's findings, and because he voluntarily terminated his employment relationship with Parkview before any formal peer review committee had been formed, he cannot be heard now to complain that his rights were ignored so as to defeat the defendants' immunity defense.

The facts of this case make clear that after Dr. Johnson learned of possible problems with Dr. Rouben's behavior he immediately enlisted Ms. Jacquay and initiated an investigation. He also met with Dr. Rouben to inform him that allegations had been made and that an investigation would ensure. Dr. Rouben denied the allegations and exercised his right under his *locum tenens* contract to terminate his relationship with Parkview. By Dr. Rouben's own admission, it was nearly three months later that he contacted Parkview and requested a meeting or hearing so he could rebut the allegations. But by then Dr. Rouben was no longer working at Parkview and had voluntarily terminated his contract. Then, when Ms. Jacquay completed her report and Dr. Rouben was invited to another meeting to discuss the results of the investigation, albeit on his last day working at Parkview, he declined. By his own admission, Dr. Rouben took no steps to request a meeting, a hearing, or to review Ms. Jacquay's report, until October 28, 2008, long after his employment at Parkview ended. Plaintiff's Response, p. 3. Dr. Rouben presents no evidence that Parkview did anything to prevent him from scheduling a meeting or hearing to present his rebuttal. And it is undisputed that when offered a meeting on September 3, 2008, he declined because he did not want to talk to anyone from Parkview. Accordingly, Parkview and Dr. Johnson are entitled to immunity pursuant to the Indiana Peer Review statute.

## 2. Lack of *prima facie* case for defamation.

Dr. Rouben contends that when Dr. Johnson and Dena Jacquay spoke by phone with representatives of Gulfport Memorial, which they did on October 22, 2008, and again on October 28, 2008, (Deposition of Connie Keel, filed under seal, docket at 36-1, pp. 16-17), they revealed the details of their investigation and that these "communications made to Gulfport in this case were false, defamatory, and, at least, in violation of Indiana's peer review statutes." Plaintiff's Response, p. 5.

Under Indiana law, a claim for defamation is defined as follows:

> A communication is defamatory if it "tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Kelley v. Tanoos,* 865 N.E.2d 593, 596 (Ind. 2007) (quoting *Rambo v. Cohen,* 587 N.E.2d 140, 145 (Ind.Ct.App.1992), *trans. denied* ). The elements of defamation include: (1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages. *Kelley v. Tanoos,* 865 N.E.2d 593. The determination of whether a communication is defamatory is a question of law for the court. *Id.* Finally, "[a]ny statement actionable for defamation must not only be defamatory in nature, but [also] false." *Trail v. Boys & Girls Clubs of Nw. Ind.,* 845 N.E.2d 130, 136 (Ind.2006).

*W.S.K. v. M.H.S.B.* 922 N.E.2d 671, 693-694 (Ind.App. 2010). Dr. Rouben makes the blanket assertion in his pleadings that Dr. Johnson and Dena Jacquay made false and defamatory statements to officials at Gulfport and that they did so with malice. Plaintiff's Response, p. 5.

The information that Dr. Johnson and Ms. Jacquay provided to officials at Gulfport is set forth in the sealed deposition of Ms. Connie Keel, who was the director of medical staff services at Gulfport. Keel Deposition, docket at 36-1, p. 5. It is undisputed that Dr. Johnson and Ms. Jacquay did not realize that their conversations with these representatives were recorded. The Court has carefully reviewed the deposition transcript, as well as Dr. Johnson's deposition

transcript (docket at 35-5). Again, without compromising the confidential nature of these documents, it is quite clear from the transcripts that Dr. Johnson and Ms. Jacquay relayed to the Gulfport representatives that several Parkview employees had lodged complaints about Dr. Rouben's comments and/or behavior. Whether these allegations were false, i.e., whether the complaining employees were lying, is not the point. What is relevant is that Dr. Johnson and Ms. Jacquay had received complaints about Dr. Rouben and initiated an internal investigation pursuant to Parkview's bylaws. When contacted by members of the Gulfport credentialing committee, Dr. Johnson and Ms. Jacquay explained the nature of the complaints they had received, that they had conducted an investigation, and that the results of the investigation substantiated the allegations. *See, for e.g.*, Deposition of Connie Keel, pp. 30-32. Dr. Johnson even told the Gulfport representatives that he had "tried to be as truthful with this as I could because it's been so hard for everybody involved." *Id*., p. 31. It is also quite telling that Dr. Johnson made positive and complimentary remarks about Dr. Rouben's clinical skills during his conversations with the Gulfport credentialing committee, and indicated that he believed Dr. Rouben could "be successful" as a physician at another hospital. *Id*., pp. 45-47. At many points during the recorded phone conversations, Dr. Johnson expressed remorse about the entire situation between Parkview and Dr. Rouben, and commented that the situation had caused him a great deal of stress. *Id*., pp. 30 *et seq*.

As defendants put it, "the recorded phone conversation containing Dr. Johnson's comments make it abundantly clear that defendants bore Dr. Rouben no ill will. . . . It is clear from Dr. Johnson's comments to Gulfport that they were considered confidential by both parties . . . truthful (there is no evidence that substantial charges had *not* been made against Dr. Rouben)

14

and . . . made by Dr. Johnson with the utmost respect for Dr. Rouben and giving him every benefit of the doubt." Defendants' Reply, p. 6.

The Court agrees with defendants' assessment of the comments made by Dr. Johnson to representatives of Gulfport. To reiterate, "[t]he determination of whether a communication is defamatory is a question of law for the court. . . . Finally, "[a]ny statement actionable for defamation must not only be defamatory in nature, but [also] false." *W.S.K. v. M.H.S.B.* 922 N.E.2d at 693-694 (Ind.App. 2010) (internal citations omitted). In the present case, the representations made by defendants to Gulfport were true–allegations were made against Dr. Rouben by Parkview employees and Parkview conducted an informal investigation that substantiated those allegations. For these reasons, plaintiff's defamation claim must fail as a matter of law.

### 3. Signed release.

Defendants also argue that, notwithstanding Dr. Rouben's complaint that he was denied due process, they are not liable to him in any way since he signed a release. As part of his application for privileges at Gulfport, Dr. Rouben signed a release which, "[i]n exchange for medical staff membership at Gulfport, [he] agreed, *inter alia*, to:

> Release from liability any and all individuals and organizations who provide information to the Hospital or the Medical Staff, in good faith and without malice, concerning my professional competence, background, experience, ethics, character, utilization practice patterns, and other qualifications for staff appointment and clinical privileges[.]"

Defendants' Memorandum, p. 22. The defendants maintain that even if they are not entitled to immunity from Dr. Rouben's claims pursuant to the Indiana Peer Review statutes, "the release executed by Dr. Rouben was clearly designed to extend protection to the defendants and, thus,

offers further protection to them from Rouben's defamation claims.  Accordingly, even if defendants did not enjoy immunity under Indiana's Peer Review statute for information conveyed to Gulfport Dr. Rouben has released them from any claims arising from furnishing such information."  *Id.*

In response, Dr. Rouben claims that the release is invalid because, according to him, the comments made by Dr. Johnson and Ms. Jacquay to Gulfport "were false, defamatory, and, at least, in violation of Indiana's peer review statutes.  In order for Defendants to be released from liability for the communications in question, this Court must interpret the [release] cited by defendants to include illegal communications."  Plaintiff's Response, p. 5.  The Court has already determined, as explained above, that the communications were not defamatory or in violation of the Indiana peer review statute and so Dr. Rouben's argument on this point is unavailing.  The release offers defendants additional protection from Dr. Rouben's claims.

### 3.  Tortious interference with business relationship and tortious interference with contract.

Plaintiff included in his complaint claims against defendants for tortious interference with a business relationship and tortious interference with contract, alleging that defendants' actions caused him to lose the opportunity for employment with Gulfport.  Fourth Amended Complaint, pp. 5-6.  As to the interference with business relationship allegation, Dr. Rouben stated that "Defendants have negligently, willfully, and/or intentionally lied to, or placed Plaintiff in a negative false light to, [Gulfport] about the status of Plaintiff's clinical privileges and his fulfillment of his contract with Parkview Hospital."  *Id.*, p. 5.  He alleged that "[t]hese actions were calculated to interfere with the business relationship with Plaintiff and [Gulfport]."  *Id.*  As to the interference with contract claim, Dr. Rouben stated that "Defendants negligently,

intentionally, willfully and/or maliciously interfered with Plaintiff's lawful employment contract with [Gulfport].  *Id.*, p. 5.  Dr. Rouben then elaborated that "Defendants willfully and intentionally lied to [Gulfport] about the status of Plaintiff's clinical privileges and the completion of the contract with Parkview Hospital."  *Id.*

These allegations concern a brief time when there was, in fact, some apparent confusion about whether Dr. Rouben's clinical privileges had been terminated by Parkview, although both parties agree that those privileges were never revoked or terminated by Parkview (since Dr. Rouben exercised his right to terminate his contract himself before any adverse action was taken by Parkview).  The evidence, however, reveals that this was simply a misunderstanding and that Dr. Johnson explained to officials with the Gulfport credentialing committee, both during a phone conversation and later in writing, that Dr. Rouben's clinical privileges were *not* terminated.  During one of his phone conversations with Gulfport, Dr. Johnson cleared up any confusion about this issue by explaining that "[t]he allegations were substantiated, and that the timing of when he had left, and when he had turned in his 30-day notice, we did not terminate his privileges."  Keel Deposition, p. 25 (Dr. Johnson speaking).  Moments later, an official with Gulfport asked, "Okay.  So y'all did not take away any privileges of his?"  Dr. Johnson responded, "No."  *Id.*, p. 27.  Finally, by way of a letter to Gulfport dated October 29, 2008, Dr. Johnson reiterated that Dr. Rouben's clinical privileges at Parkview had never been terminated.  *Id.*, attachment (letter from Dr. Johnson to Dr. Donn Bowers[7]).

_____

[7] Dr. Bowers was Chief of Staff at Gulfport and was a member of the Gulfport credentialing committee reviewing Dr. Rouben's application for employment.

Dr. Rouben has maintained that his business relationship with Gulfport and his contract with Gulfport were not consummated as a result of the alleged "lie" Parkview told about the termination of Dr. Rouben's privileges at Parkview. But the evidence is clear that this issue was clarified by Dr. Johnson and there is no evidence whatsoever to suggest that it had any impact on the ultimate failure of Dr. Rouben and Gulfport to finalize an employment contract between those two parties.

In addition, as defendants point out, at the time of the conversations between Dr. Johnson and Ms. Jacquay and officials at Gulfport, Dr. Rouben's application for employment with Gulfport was incomplete. In a letter written to Dr. Rouben on November 18, 2008, Dr. Bowers informed him that his application for privileges at Gulfport was "incomplete" and could not be processed because Dr. Rouben had failed to provide Gulfport with a "valid Mississippi medical license, a current certificate of insurance, and a professional reference from a Department Chair at Pikeville Medical Center (a hospital where Dr. Rouben had previously worked). *Id.*, attachment.

For all of the forgoing reasons, the evidence does not support Dr. Rouben's contention that Dr. Johnson or anyone else from Parkview "lied" about the termination of his clinical privileges by Parkview and also that Dr. Johnson made several efforts to ensure that Gulfport officials were made aware that this was the case. Accordingly, defendants are entitled to summary judgment on Dr. Rouben's claims for tortious interference with business relationship and tortious interference with contract.[8]

_____

[8] Under Indiana law, one of the elements of a *prima facie* case of tortious interference with a business relationship requires a plaintiff to establish that a defendant intentionally interfered with a relationship between the plaintiff and a third party and that such interference is

**4. Civil conspiracy.**

Plaintiff included in his complaint a claim for what he terms "civil conspiracy." Fourth Amended Complaint, p. 8. Dr. Rouben frames this claim by stating that "[d]efendants have intentionally, willfully, maliciously, and tortiously conspired among themselves and others to unlawfully injure Plaintiff as set forth in the foregoing paragraphs. The Defendants' scheme was calculated to and in fact did interfere with Plaintiff['s] lawful business relations and Plaintiff['s] lawful contractual relations, and defame Plaintiff." *Id.*

Defendants respond to this claim by arguing that "[c]ivil conspiracy is defined as a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Defendants' Memorandum, pp. 30-31. Defendants argue that "none of the defendants employed unlawful means or attempted to accomplish an unlawful purpose. Defendants investigated serious charges of misconduct lodged against Dr. Rouben and reported accurately to Gulfport Dr. Rouben's status [with Parkview]." *Id.*, p. 31. Dr. Rouben does not respond to this argument and, in fact, does not even mention his "civil conspiracy" claim in his response brief. In any event, the claim

---

done in "the absence of justification." *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 n. 1 (Ind. 2001) (internal citation omitted). Also under Indiana law, one of the elements of a *prima facie* case of tortious interference with contract requires a plaintiff to establish that a defendant knew about the existence of a contract between plaintiff and a third party, and that defendant intentionally induced a breach of that contract. *Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind.App. 2000). As stated above, the evidence does not support either claim and, in fact, the evidence supports defendants' position that they did nothing to interfere with negotiations between Dr. Rouben and Gulfport. As defendants correctly point out, "Parkview's conduct in transmitting information during the Mississippi credentialing process was not unjustified." Rather, it was provided in response to inquires from the Gulfport credentialing committee and "defendants were justified in truthfully supplying information to Gulfport about Dr. Rouben's time at Parkview." Defendants' Memorandum, pp. 24-25.

is based on the alleged defamatory statements Dr. Rouben says defendants made to Gulfport for the purpose of sabotaging his potential employment contract with Gulfport. The Court has already explained that plaintiff's claims do not pass muster as a matter of law, and this same reasoning applies to plaintiff's claim for "civil conspiracy."

**5. Motion to strike.**

As stated at the outset, defendants filed a motion to strike portions of an affidavit Dr. Rouben submitted in support of his opposition to defendants' motion for summary judgment. Motion to Strike, docket at 45. Specifically, defendants object to a paragraph in that affidavit wherein Dr. Rouben states, "[o]n information and belief, a favorable recommendation from Pikeville Medical Center was forwarded to Gulfport Memorial Hospital[.]" Plaintiff's Response, docket at 40-1, p. 11, ¶ 6. This statement obviously is intended to demonstrate that Pikeville, one of Dr. Rouben's former employers, did in fact provide a reference letter to Gulfport. The statement was included in Dr. Rouben's affidavit for the purpose of bolstering his accusation that "[t]he only deficiency preventing my state licensing approval in Mississippi was Parkview's failure to respond to requests from the Mississippi Board of Medical Licensure[,]" *Id.*, ¶ 4.

Defendants argue in their motion to strike that that paragraph of Dr. Rouben's affidavit falls short of the requirements set forth in Fed.R.Civ.P. 56(c)(4), which "requires that affidavits employed to support or oppose a motion for summary judgment 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" Motion to Strike, p. 1. Defendants also point out that "in our circuit the courts have observed that the 'personal knowledge' requirement for affidavits is not satisfied by recitals based upon 'information and belief.'" Defendants'

Memorandum in Support of Motion to Strike, docket at 46, p. 2 (quoting *Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000)).

Dr. Rouben concedes in his response brief that "[d]efendants have properly stated the law regarding averments made on 'information and belief' and their motion is properly founded." Plaintiff's Response, docket at 47, p. 1. Still, he argues that the Court should consider his statement since he worked at Pikeville prior to working at Parkview, that there is "no evidence to suggest any work experience at Pikeville following Dr. Rouben's time at Parkview, much less negative work experience . . ." and that he still passed the credentialing requirements prior to starting his contract with Parkview. *Id.* In other words, Dr. Rouben takes the position that Parkview is attempting to claim that the lack of a professional reference from Pikeville to Gulfport was the "ultimate reason that Dr. Rouben lost his job with Gulfport . . ." *Id.*

As discussed above, according to Dr. Bowers's letter sent to Dr. Rouben on November 18, 2008, there were several items missing from Dr. Rouben's application at that point in time, a reference from Pikeville being just one of them. It is abundantly clear from the record that Parkview is not hanging its hat on this one piece of information. But none of this changes the calculus in this case. Defendants are correct that statements in an affidavit must be made "on personal knowledge" and not on "information and belief." For this reason, the motion to strike is well taken. In addition, the evidence is clear that this missing reference (if it was missing) was one of several items not provided to Gulfport at the time Dr. Rouben decided to withdraw his application for privileges. More importantly, since the statement the parties are arguing about had no impact on the Court's analysis, the motion is denied as moot.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by defendants Parkview Hospital and Dr. Johnson (docket at 33) is GRANTED; the motion to strike (docket at 45) is DENIED AS MOOT.  The Clerk is directed to enter judgment in favor of defendants and against plaintiff.


Date: June 6, 2013.


　　　　　　　　　　　　　　　　　　　　　  /s/   William C. Lee
　　　　　　　　　　　　　　　　　　　　　William C. Lee, Judge
　　　　　　　　　　　　　　　　　　　　　United States District Court
　　　　　　　　　　　　　　　　　　　　　Northern District of Indiana